# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

### Holding a Criminal Term

### Grand Jury Sworn in on May 11, 2006

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL NO. |
| | ) | |
| v. | ) | GRAND JURY ORIGINAL |
| | ) | |
| GERARDO ANTONIO AGUILAR  RAMIREZ, | ) | VIOLATIONS: |
| also known as Cesar, | ) | |
| also known as El Cucho, | ) | 18 U.S.C. § 2339B(a)(1) |
| | ) | (Conspiracy to Provide Material |
| NANCY CONDE RUBIO, | ) | Support or Resources to a |
| also known as Doris Adriana, | ) | Foreign Terrorist Organization) |
| also known as Alexandra Rubio Silva, | ) | |
| also known as Maritza, | ) | 18 U.S.C. § 2339B(a)(1) |
| also known as La Senora, | ) | (Providing Material Support or |
| also known as La Tia, | ) | Resources to a Foreign Terrorist |
| also known as La Mona, | ) | Organization) |
| also known as Luz Dary, | ) | |
| | ) | 18 U.S.C. § 2 (Aiding and Abetting |
| ALEXANDER FARFAN SUAREZ, | ) | and Causing an Act to be Done) |
| also known as Enrique Gafas, | ) | |
| | ) | 18 U.S.C. § 1203 |
| ANA ISABEL PENA AREVALO, | ) | (Hostage Taking) |
| also known as Dona Chava, | ) | |
| also known as Dona Isa, | ) | |
| also known as Isabela, | ) | |
| also known as Elisa, | ) | |
| | ) | |
| LUZ MERY GUTIERREZ VERGARA, | ) | |
| also known as Mery, | ) | |
| also known as Luz Mery, | ) | |
| | ) | |
| JOSUE CUESTA LEON, | ) | |
| also known as El Viejo, | ) | |
| also known as Don Julio, | ) | |
| also known as El Gordo, | ) | |
| | ) | |
| JOSE FERNANDO ROMERO MEJIA, | ) | |
| also known as El Morocho, | ) | |
| also known as La Negra, | ) | |

**MARIBEL GALLEGO RUBIO,**         )
**also known as Maritza,**           )
**also known as Mary,**            )
            )
**CAMILO RUEDA GIL,**        )
**also known as El Primo,**        )
**also known as El Paisa,**         )
**also known as Muneca,**        )
            )
**ANA LEONOR TORRES,**       )
**also known as Juliana,**         )
**also known as Catalina,**        )
**also known as Cata,**            )
**also known as Maria,**           )
            )
**BLADIMIR CULMA SUNZ,**     )
**also known as Vladimir,**        )
            )
         **Defendants.**     )

## I N D I C T M E N T

The Grand Jury charges that:

## COUNT ONE

### CONSPIRACY TO PROVIDE MATERIAL SUPPORT TO A DESIGNATED FOREIGN TERRORIST ORGANIZATION (REVOLUTIONARY ARMED FORCES OF COLOMBIA)

At all times relevant to this Indictment:

**A.  Background**

1.      The Revolutionary Armed Forces of Colombia – an English translation of the Spanish name of the group "Fuerzas Armadas Revolucionarias de Colombia" (commonly known as and referred to hereinafter as the "FARC") – is an armed and violent organization in the Republic of Colombia.

2.    The FARC is, and has been since its inception in 1964, engaged in armed conflict against the government of the Republic of Colombia, which is a constitutional, multi-party democracy.  The FARC seeks to destabilize all levels of the Colombian government by means of violence, including murders and hostage takings, threats of violence, and other terrorist related activities.  The FARC's activities throughout Colombia have caused hundreds of civilian deaths and injuries.

3.    The FARC has been strongly anti-American, characterizing American citizens as "military targets," it has engaged in violent acts against Americans in Colombia, including murders and hostage takings.

4.    The FARC is a designated foreign terrorist organization, having been so designated pursuant to Title 8, United States Code, Section 1189, by the Secretary of State of the United States, initially in October 1997, and most recently on October 11, 2005.  As a result of this designation, it is unlawful for persons subject to the jurisdiction of the United States to provide material support and resources to the FARC.

5.    To supply itself, the FARC relies on a support (or logistical) network of individuals with access to Colombia's metropolitan and commercial centers, such as Bogota and Villavicencio, and access to product markets in other countries, and in addition relies on individuals involved in trafficking in narcotics, who have access to weapons, foreign currency, and other supplies, such as high technology communications equipment.  Narcotics traffickers obtain FARC-produced or FARC-controlled cocaine, deliver it to neighboring countries, and in return transport weapons, ammunition, money and other supplies to the FARC.  These traffickers use their drug networks to procure these items and transport them to the FARC in airplanes via clandestine airstrips located in

Colombia and Venezuela, in trucks, and in river boats navigating remote jungle rivers that traverse rural areas of Colombia and neighboring countries. These narcotics traffickers and other members of the logistical network transport currency, high technology communications equipment, computers, military materiel, and other materials and supplies from other countries and urban areas of Colombia into the rural regions of Colombia controlled by the FARC. The members of the support network conduct their trade and transactions in Colombia's metropolitan and commercial centers, including Bogota and Villavicencio, in other countries in South America, Central America, and in the United States.

6.      The FARC's support network requires communication between all parties to succeed. The remote rural and jungle areas of Colombia controlled by the FARC lack a sophisticated communications network. No telephone land lines operate there. No cellular telephone service is available. Satellite telephone is the sole long range means of electronic voice communication. HF radios (also known as two-way radios or walkie-talkies) are readily available, but they have a very limited range. The FARC uses satellite phones in order to communicate with its logistical support network in major Colombian urban areas and beyond, including the United States.. The FARC uses HF radios to reach closer urban outposts such as Villavicencio. In addition to communicating with members of its logistical network located in Villavicencio, the FARC uses the radio call centers located in Villavicencio, more fully described below, to connect into the land line and cellular phone services available from that urban area to communicate with members of its logistical network located in other major Colombian urban areas and beyond.

7.      The FARC is divided into seven guerrilla blocs, which are further divided into fronts. A large and trusted FARC logistical network is controlled by FARC 1st Front Commander

GERARDO ANTONIO AGUILAR RAMIREZ, also known as Cesar, also known as El Cucho (hereinafter "CESAR"), and FARC 1st Front fourth-ranking member NANCY CONDE RUBIO, also known as Doris Adriana, also known as Alexandra Rubio Silva, also known as Maritza, also known as La Senora, also known as La Tia, also known as La Mona, also known as Luz Dary (hereinafter "DORIS ADRIANA"). CESAR and DORIS ADRIANA direct other members of the logistical support network to obtain materials and supplies, including communications equipment, from persons operating businesses in the United States; use these other members to transport these materials as well as the money used to finance the logistical support network; use these other members to set up a communications network to operate the logistical support network; and use the high technology communications equipment, such as satellite telephones procured from the United States and other communications devices, to facilitate the shipment of materials and supplies to the FARC and to transfer funds from the FARC to members of the conspiracy for the purchase of materials and supplies. ALEXANDER FARFAN SUAREZ, also known as Enrique Gafas (hereinafter "ENRIQUE GAFAS"), is a high ranking officer within the FARC's 1st Front, and is responsible for maintaining the logistical supply network's human commodity – the hostages. He is charged by 1st Front Commander CESAR with restraining and transporting hostages held by the FARC.

8.      The logistical network's base of operations is in the city of Villavicencio, which sits on a plateau on the edge of Colombia's easternmost mountain range approximately a two-hour drive from Colombia's capital city of Bogota. Villavicencio overlooks the dense jungle and rural areas of southeastern Colombia and is known as the "Gateway to the Jungle."

9.      CESAR and DORIS ADRIANA often communicate with their logistical network

through radio call centers located in Villavicencio.  These centers have the technical capacity to receive calls from FARC members using short-range radios, and to patch them through to the more advanced and long-range land line and cellular phone network operating in the more urban parts of Colombia, and to patch calls to other countries, including the United States.  Two of these call centers are owned and operated on behalf of the FARC by ANA ISABEL PENA AREVALO, also known as Dona Chava, also known as Dona Isa, also known as Isabela, also known as Elisa (hereinafter "PENA AREVALO"), and LUZ MERY GUTIERREZ VERGARA, also known as Mery, also known as Luz Mery (hereinafter "GUTIERREZ VERGARA").  The call centers also are used to deliver and receive oral and written messages, and as a drop-off and pick-up site for money.

10.     Defendants JOSUE CUESTA LEON, also known as El Viejo, also known as Don Julio, also known as El Gordo  (hereinafter "CUESTA LEON"), and Jose Fernando Romero Mejia, also known as El Morocho, also known as La Negra (hereinafter "ROMERO MEJIA"), along with other co-conspirators whose identities are known to the Grand Jury, supply the FARC with weapons and munitions in exchange for receiving cocaine from the FARC.

**B.  Jurisdiction and Venue**

11.     All events alleged in this Indictment took place in the Republic of Colombia, outside the United States, that is, not within any state or district.  Accordingly, the offenses charged are within the extraterritorial jurisdiction of the United States, pursuant to Title 18, United States Code, Section 2339B(d), and within the venue of the United States District Court for the District of Columbia, pursuant to Title 18, United States Code, Section 3238.

**C.  The Conspiracy**

12.     From on or before at least sometime in 2002, the exact date being unknown to the

Grand Jury, and continuing thereafter up to and including at least July 2007, in the Republic of

Colombia, defendants CESAR, DORIS ADRIANA, ENRIQUE GAFAS, PENA AREVALO,

CUESTA LEON, ROMERO MEJIA, GUTIERREZ VERGARA, MARIBEL GALLEGO RUBIO,

also known as Maritza, also known as Mary (hereinafter "GALLEGO RUBIO"), CAMILO RUEDA

GIL, also known as El Primo, also known as El Paisa, also known as Muneca (hereinafter "RUEDA

GIL"), ANA LEONOR TORRES, also known as Juliana, also known as Catalina, also known as

Cata, also known as Maria (hereinafter "TORRES"), BLADIMIR CULMA SUNZ, also known as

Vladimir (hereinafter "CULMA SUNZ"), and co-conspirators not indicted herein, did knowingly

combine, conspire, confederate and agree, together, with each other, and with others known and

unknown to the Grand Jury, to provide material support and resources to a designated foreign

terrorist organization, namely the FARC, knowing that the organization was designated as a terrorist

organization, has engaged or engages in terrorist activity, and has engaged or engages in terrorism.

## OBJECT OF THE CONSPIRACY

13.     It was a purpose and object of the conspiracy for the defendants and their co-

conspirators to assist the FARC by establishing and personally serving in a logistical support and

supply network designed to procure weapons, ammunition, high technology devices, money, and

other materials and supplies, and to transport and deliver these and other commodities, including

hostages, to and among the FARC.

## MANNER AND MEANS

14.     The manner and means by which the defendants and their unindicted co-conspirators,

both known and unknown to the Grand Jury, sought to accomplish the object of the conspiracy

included, among other things, the following:

(a)     Members of the conspiracy found buyers for and then transported by air for profit, via clandestine airstrips located in Colombia and Venezuela, cocaine produced in southeast Colombian departments including, but not limited to, Meta, Guaviare and Vaupes.

(b)     Buyers of the cocaine who were members of the conspiracy assisted the logistical support network by identifying and utilizing transport routes for taking FARC produced or controlled cocaine out of the FARC controlled areas, and for bringing materials and supplies, including weapons, ammunition, and satellite phones to the FARC controlled areas.

(c)     Members of the conspiracy, in partial payment for the cocaine, received and surreptitiously delivered weapons such as AK-47 and AR-15 assault-type weapons and ammunition to FARC members in the jungle areas of southeast Colombia.

(d)     Members of the conspiracy used profits from the sale of cocaine to procure communications equipment purchased in the United States, such as satellite telephones, SIM cards, and other high technology devices, and then used this equipment to operate the logistical supply network.

(e)     Members of the conspiracy used communications equipment, such as satellite telephones and HF radios, and the radio call centers to communicate with each other in order to facilitate the procurement and shipment of supplies intended for the FARC, and to facilitate the transfer of funds from the FARC to members of the conspiracy, who used the funds to purchase or transport supplies intended for the FARC.

(f)     Members of the conspiracy shipped materials and supplies from various urban areas within Colombia and from other countries, including the United States, to the city of Villavicencio.  From Villavicencio, members of the conspiracy covertly supplied the FARC by,

among other means, flying materials on small twin engine planes, such as DC-3s, to rural and jungle airstrips in areas influenced or controlled by the FARC, whereupon they were transported to FARC camps via truck or river boat.  FARC members also delivered large sums of cash to Villavicencio to be picked up by members of the conspiracy for the purpose of financing the purchase of materials and supplies.

(g)    CESAR and DORIS ADRIANA were the leaders of the conspiracy.  CESAR was the commander of the 550-person 1st Front.  DORIS ADRIANA was the 1st Front's fourth ranking member and is in charge of the logistical network.  She was responsible for not only supplying the 1st Front with materials and supplies, including high technology communications equipment, but also with supplying other fronts in the FARC's Eastern and Southern Blocs with high technology communications equipment and other materials and supplies.

(h)    DORIS ADRIANA used her logistical network to supply the FARC with material items.  Operating from FARC-controlled rural and jungle areas where no land line or cellular phone service was available, she communicated with other members of the network located in urban areas in one of two ways:

(i)    DORIS ADRIANA would use satellite phones purchased from telecommunications companies located in Miami, Florida and/or Bogota, Colombia, to communicate directly with her network in order to purchase materials and supplies, to arrange for the purchase of materials and supplies, to arrange for the transport of materials and supplies, and to arrange for the transfer of funds to pay for the purchase of materials and supplies.  She also would use satellite telephones to contact the telecommunications company located in Miami, Florida, to purchase additional use minutes for the phone, and, together with CESAR, to obtain technical advice on the

use and operation of the satellite telephones;

(ii)     DORIS ADRIANA would use call centers located in the city of Villavicencio to patch through calls to members of her logistical network.  Villavicencio is the major urban area closest to the rural and jungle areas controlled by the FARC's Eastern Bloc.  Call centers are communications businesses that had the technology to receive calls from rural and jungle areas via HF radios, and then patch those calls through to land lines and cell phones located in any other urban area in Colombia or in other countries, including the United States.

(i)     DORIS ADRIANA would arrange for funds to be delivered to members of the logistical network located in Villavicencio, Bogota, and other locations.  Members of the logistical network, at the direction of DORIS ADRIANA, would then order and receive materials and supplies intended for the FARC, and then ship them to DORIS ADRIANA and the FARC.  Members of the material support network based in Villavicencio or Bogota also would travel throughout Colombia, meet with other members of the material support network in order to obtain, ship, or deliver additional materials and supplies back to Villavicencio for shipment to the FARC.  Members of the logistical network oftentimes would prepare fraudulent air shipment manifests or bribe airport or airline employees in order to fraudulently ship material items to the FARC through Vanguardia Airport in Villavicencio.

## OVERT ACTS

15.     In furtherance of the conspiracy and to effect its object, one or more of the co-conspirators committed and caused to be committed at least one of the following overt acts, among others:

(1)     From on or about sometime in 2002, and continuing through on or about

-10-

October 15, 2006, CUESTA LEON, ROMERO MEJIA, Jose Maria Corredor Ibague, also known as Boyaco, also known as Chepe, also known as Don Jose (hereinafter "Boyaco"), and Edilma Morales Loaiza, also known as Maria Ofelia, also known as La Negra, also known as Marucha, also known as Carolina, also known as Carolina Yanave Rojas (hereinafter "La Negra"), two co-conspirators not indicted herein, together with co-conspirators unknown to the Grand Jury, regularly provided the FARC with weapons including rifles, rifle scopes, pistols, shotguns, bomb fuses, and ammunition in the departments of Guaviare, Vaupes and Amazonas.

(2)     On or about sometime in 2002, Boyaco delivered approximately 70 AK-47 assault-type weapons to the FARC at a clandestine airstrip located in Caruru, department of Vaupes.

(3)     On or about sometime in 2002, ROMERO MEJIA delivered approximately 24 Remington brand sniper rifles with telescopes to the FARC's 1st Front in Pacoa, department of Amazonas.

(4)     On or about sometime in January 2003, CUESTA LEON delivered approximately 50 AK-47 assault-type weapons to the FARC's 1st Front.

(5)     From in or about February 2003, and continuing through in or about September 2004, a co-conspirator, whose identity is known to the Grand Jury, provided satellite telephones and SIM cards originating from the United States to Boyaco, who in turn provided them to the FARC, including to high ranking FARC members CESAR and DORIS ADRIANA.

(6)     In or about May 2003, Boyaco introduced a co-conspirator, whose identity is known to the Grand Jury, to DORIS ADRIANA for the purpose of allowing DORIS ADRIANA to purchase satellite telephones, SIM cards, and HF radios, all originating in the United States, directly from the co-conspirator.

(7)     From in or about sometime in October 2003, and continuing through in or about sometime in June 2005, TORRES received funds from DORIS ADRIANA, and used these funds to purchase, or to have others purchase on her behalf, materials and supplies intended for FARC-related activities.

(8)     On or about October 9, 2003, TORRES informed DORIS ADRIANA that TORRES had sent two high frequency ICOM V-8 radios to her, to be used for FARC-related activities.

(9)     On or about sometime in 2004, Boyaco delivered approximately 55 AK-47 assault-type weapons and 25 Beretta handguns to the FARC at a clandestine airstrip located in Pacoa, department of Amazonas.

(10)    On or about sometime in February 2004, TORRES delivered nine GPS devices to a co-conspirator, whose identity is known to the Grand Jury, who in turn provided them to DORIS ADRIANA, to be used for FARC-related activities.

(11)    On or about sometime in February 2004, DORIS ADRIANA obtained a computer and nine GPS devices in Villavicencio that DORIS ADRIANA intended to use to further FARC-related activities.

(12)    On or about December 24, 2004, DORIS ADRIANA placed a telephone call to GUTIERREZ VERGARA and directed GUTIERREZ VERGARA to make two payments from a bank account controlled by DORIS ADRIANA to two unindicted co-conspirators, whose identities are known to the Grand Jury, of funds to be used to purchase materials and supplies for FARC-related activities.

(13)    On or about sometime in 2005, La Negra contacted a known FARC member

and informed that member that she had weapons ready to be delivered to the FARC.

(14)     On or about sometime in 2005, a short time after events described in overt act 13, Boyaco delivered approximately 15 AR-15 assault-type weapons and two Mini FAL machine guns to a FARC commander, whose identity is known to the Grand Jury, in Pacoa, department of Amazonas.

(15)     On or about February 5, 2005, DORIS ADRIANA placed a telephone call, with the assistance of PENA AREVALO and through a call center in Villavicencio owned and operated by PENA AREVALO, to La Negra, and sought to send 300,000 Venezuelan Bolivars to Venezuela through the Colombian city of Cucuta with the assistance of RUEDA GIL, for the purpose of obtaining materials and supplies for the FARC.

(16)     On or about sometime in March 2005, DORIS ADRIANA ordered and received three high frequency two-way radios from the United States and from a co-conspirator, whose identity is known to the Grand Jury, and the high frequency two-way radios were delivered by another co-conspirator, whose identity is known to the Grand Jury, and were intended to be used by DORIS ADRIANA to further FARC-related activities.

(17)     On or about March 6, 2005, DORIS ADRIANA placed a telephone call, with the assistance of GUTIERREZ VERGARA and through a call center in Villavicencio owned and operated by GUTIERREZ VERGARA, to a co-conspirator, whose identity is known to the Grand Jury, and inquired about the status of a shipment intended for the FARC, and directed GUTIERREZ VERGARA to instruct TORRES to deliver to the call center money intended for the FARC.

(18)     On or about March 28, 2005, DORIS ADRIANA placed a telephone call to an unindicted co-conspirator, whose identity is known to the Grand Jury, and directed that unindicted

co-conspirator to arrange to purchase satellite telephones and SIM cards originating in the United States from an unindicted co-conspirator, whose identity is known to the Grand Jury, that DORIS ADRIANA intended to be used to further FARC-related activities.

(19)     On or about April 14, 2005, DORIS ADRIANA obtained a satellite telephone and SIM card originating in the United States from a co-conspirator, whose identity is known to the Grand Jury, that DORIS ADRIANA intended to use to further FARC-related activities.

(20)     On or about April 21, 2005, DORIS ADRIANA placed a telephone call, with the assistance of GUTIERREZ VERGARA and through a call center in Villavicencio owned and operated by GUTIERREZ VERGARA, to an unindicted co-conspirator, whose identity is known to the Grand Jury, and sought to acquire and arranged to purchase satellite telephones originating in the United States, that DORIS ADRIANA intended to use to further FARC-related activities.

(21)     On or about April 25, 2005, DORIS ADRIANA placed a telephone call to an unindicted co-conspirator, whose identity is unknown to the Grand Jury, and directed that co-conspirator to contact RUEDA GIL for the purpose of arranging the purchase of airplane fuel that DORIS ADRIANA intended to use to further FARC-related activities.

(22)     On or about May 6, 2005, DORIS ADRIANA placed a telephone call to PENA AREVALO and directed her to purchase communications equipment, an antenna, that DORIS ADRIANA intended to use to further FARC-related activities.

(23)     On or about May 16, 2005, DORIS ADRIANA obtained a satellite telephone originating in the United States from a co-conspirator, whose identity is known to the Grand Jury, that DORIS ADRIANA intended to use to further FARC-related activities.

(24)     On or about May 16, 2005, DORIS ADRIANA placed a telephone call to

GUTIERREZ VERGARA, and directed her to provide TORRES with a list of materials and supplies that TORRES should obtain for DORIS ADRIANA and that DORIS ADRIANA intended to use to further FARC-related activities.  DORIS ADRIANA and GUTIERREZ VERGARA also discussed obtaining fuel that DORIS ADRIANA intended to use to further FARC-related activities. GUTIERREZ VERGARA also delivered a message to DORIS ADRIANA from a co-conspirator, whose identity is known to the Grand Jury, regarding the purchase of satellite telephones and SIM cards that DORIS ADRIANA intended to use to further FARC-related activities.

(25)    On or about June 10, 2005, DORIS ADRIANA placed a telephone call to GUTIERREZ VERGARA and directed her to instruct TORRES to deliver five million Colombian pesos to an unindicted co-conspirator, whose identity is known to the Grand Jury, that was intended to be used by the FARC.

(26)    On or about June 16, 2005, GUTIERREZ VERGARA informed DORIS ADRIANA that a co-conspirator, whose identity is known to the Grand Jury, was ready to deliver communications equipment, including SIM cards, from the United States, that was intended to be used for FARC-related activities.

(27)    On or about June 28, 2005, DORIS ADRIANA placed a telephone call, with the assistance of PENA AREVALO and through a call center in Villavicencio owned and operated by PENA AREVALO, to a co-conspirator, whose identity is known to the Grand Jury, and sought to acquire and arranged to purchase a satellite telephone and SIM cards originating in the United States that DORIS ADRIANA intended to use to further FARC-related activities.

(28)    On or about July 5, 2005, DORIS ADRIANA placed a telephone call to GUTIERREZ VERGARA and to two co-conspirators, whose identities are known to the Grand Jury,

and sought to acquire and arranged to purchase communications equipment, an antenna, and other materials and supplies, and directed one of the co-conspirators to receive five million Colombian pesos from RUEDA GIL to finance the purchase of the materials and supplies intended to be used to further FARC-related activities.

(29)     On or about July 5, 2005, DORIS ADRIANA placed two telephone calls, with the assistance of GUTIERREZ VERGARA and through a call center in Villavicencio owned and operated by GUTIERREZ VERGARA, to CULMA SUNZ, and sought to acquire and arranged to purchase weapons and ammunition, including 7.62 caliber rifles, for the FARC.

(30)     On or about August 2, 2005, DORIS ADRIANA placed a telephone call, with the assistance of PENA AREVALO and through a call center in Villavicencio owned and operated by PENA AREVALO, to GALLEGO RUBIO to inquire about the status of a shipment intended for FARC use.  DORIS ADRIANA then directed PENA AREVALO to assist in the delivery of an antenna for a communications device to DORIS ADRIANA that she intended to use to further FARC-related activities.

(31)     On or about August 2, 2005, PENA AREVALO informed DORIS ADRIANA that the antenna intended to be used by the FARC had been delivered to an unindicted co-conspirator, whose identity is unknown to the Grand Jury.  DORIS ADRIANA then directed PENA AREVALO to provide an unindicted co-conspirator, whose identity is known to the Grand Jury, with two million pesos in payment.

(32)     On or about September 28, 2005, DORIS ADRIANA placed a telephone call to a co-conspirator, whose identity is known to the Grand Jury, and placed an order with that co-conspirator for another satellite telephone originating in the United States, that DORIS ADRIANA

-16-

intended to use to further FARC-related activities.

(33)     On or about November 29, 2005, DORIS ADRIANA, during a telephone conversation with an unindicted co-conspirator, whose identity is known to the Grand Jury, confirmed a payment of 12 million Colombian pesos to that unindicted co-conspirator for communications equipment supplied by an unindicted co-conspirator, whose identity is known to the Grand Jury, to DORIS ADRIANA and intended to be used to further FARC-related activities.

(34)     On or about November 29, 2005, an unindicted co-conspirator, whose identity is known to the Grand Jury, agreed to repair a satellite phone originating in the United States and previously supplied by that unindicted co-conspirator to DORIS ADRIANA and intended to be used to further FARC-related activities.

(35)     On or about December 5, 2005, Boyaco sought to acquire and arranged to purchase satellite telephones and SIM cards originating in the United States that Boyaco and La Negra intended to use to further FARC-related activities, which Boyaco described as his "large organization."

(36)     On or about December 9, 2005, an unindicted co-conspirator, whose identity is known to the Grand Jury, purchased communications equipment, including a wireless communication device, several GPS devices, and twenty high technology compasses, from the United States and intended to be used to further FARC-related activities.

(37)     On or about December 16, 2005, an unindicted co-conspirator, whose identity is known to the Grand Jury, purchased  communications equipment, including transceivers and antennas, from the United States and intended to be used to further FARC-related activities.

(38)     On or about February 13, 2006, in Bogota, Colombia, Boyaco purchased

communications equipment, including two satellite telephones and two computers originating in the United States, and directed that they be delivered to RUEDA GIL, who later provided this communications equipment to Boyaco.

(39)     On or about July 3, 2006, La Negra, by use of a satellite telephone originating in the United States, sought to acquire approximately 300 boxes of ammunition for the FARC in Bogota, Colombia, by informing a co-conspirator, whose identity is not known to the Grand Jury, that she was awaiting the shipment of what she referred to as "300 units of seed."

(40)     On or about September 16, 2006, PENA AREVALO, on behalf of DORIS ADRIANA, sought to acquire and arranged to purchase high frequency radios from the United States and from a co-conspirator, whose identity is known to the Grand Jury, intended to be used to further FARC-related activities.

(41)     On or about October 1, 2006, GALLEGO RUBIO received a satellite telephone originating in the United States and intended to be used by DORIS ADRIANA to further FARC-related activities.

(42)     On or about October 17, 2006, PENA AREVALO, on behalf of DORIS ADRIANA, sought technical advice from a co-conspirator, whose identity is known to the Grand Jury, regarding a satellite telephone previously purchased from the United States, and referenced in Overt Act 41, and intended to be used to further FARC-related activities.

(43)     On or about October 24, 2006, DORIS ADRIANA placed a telephone call to GALLEGO RUBIO and directed GALLEGO RUBIO to purchase from a co-conspirator, whose identity is known to the Grand Jury, 350 SIM card satellite phone minutes from the United States and intended to be used by DORIS ADRIANA to further FARC-related activities.

(44)     On or about October 24, 2006, DORIS ADRIANA placed a telephone call to GALLEGO RUBIO and directed her to purchase a satellite phone from an unindicted co-conspirator, whose identity is known to the Grand Jury, that was intended to be used by DORIS ADRIANA to further FARC-related activities.

(45)     On or about November 9, 2006,  GALLEGO RUBIO received a satellite telephone originating in the United States and intended to be used by CESAR to further FARC-related activities.

(46)     On or about November 24, 2006, CESAR sought technical advice for a satellite telephone previously purchased from the United States and from a co-conspirator, whose identity is known to the Grand Jury, referenced in Overt Act 45, and intended to be used to further FARC-related activities.

(47)     On or about April 27, 2007, CESAR sought technical advice for a satellite telephone previously purchased from the United States and from a co-conspirator, whose identity is known to the Grand Jury, referenced in Overt Act 45, and intended to be used to further FARC-related activities.

(48)     On or about May 9, 2007, CESAR, through the use of high frequency radios, directed the transport of hostages, including Americans, being held by the FARC's 1st Front.

**(Conspiracy to Provide Material Support or Resources to a Designated Foreign Terrorist Organization**, in violation of Title 18, United States Code, Section 2339B(a)(1))

## COUNT TWO

### MATERIAL SUPPORT TO A DESIGNATED
### FOREIGN TERRORIST ORGANIZATION
### (REVOLUTIONARY ARMED FORCES OF COLOMBIA)

1.      The Grand Jury realleges and incorporates by reference herein paragraphs 1-12 and

14-16 from Count One of this Indictment as though fully set forth in this Count.

2.      Beginning on or about sometime in 2002, and continuing until on or about at least

July 2007, in the Republic of Colombia, defendants GERARDO ANTONIO AGUILAR RAMIREZ,

also known as Cesar, also known as El Cucho, NANCY CONDE RUBIO, also known as Doris

Adriana, also known as Alexandra Rubio Silva, also known as Maritza, also known as La Senora,

also known as La Tia, also known as La Mona, also known as Luz Dary, ALEXANDER FARFAN

SUAREZ, also known as Enrique Gafas, ANA ISABEL PENA AREVALO, also known as Dona

Chava, also known as Dona Isa, also known as Isabela, also known as Elisa, LUZ MERY

GUTIERREZ VERGARA, also known as Mery, also known as Luz Mery, JOSUE CUESTA LEON,

also known as El Viejo, also known as Don Julio, also known as El Gordo, and JOSE FERNANDO

ROMERO MEJIA, also known as El Morocho, also known as La Negra, MARIBEL GALLEGO

RUBIO, also known as Maritza, also known as Mary,  CAMILO RUEDA GIL, also known as El

Primo, also known as El Paisa, also known as Muneca, ANA LEONOR TORRES, also known as

Juliana, also known as Catalina, also known as Cata, also known as Maria, and BLADIMIR CULMA

SUNZ, also known as Vladimir, did knowingly provide and attempt to provide material support and

resources, that is, a logistical  network for weapons, high technology communications equipment,

money, and other materials and supplies, to a designated foreign terrorist organization, the FARC,

knowing that the organization was designated as a terrorist organization, has engaged or engages in

-20-

terrorist activity, and has engaged or engages in terrorism.

**(Providing Material Support or Resources to a Designated Foreign Terrorist Organization and Aiding and Abetting and Causing an Act to be Done**, in violation of Title 18, United States Code, Sections 2339B(a)(1) and 2))

## COUNT THREE

### HOSTAGE TAKING

1.      The Grand Jury realleges and incorporates by reference herein paragraphs 1-12 and 14-16 from Count One of this Indictment as though fully set forth in this Count.

2.      At all time relevant to this count, the FARC was an organization of armed individuals operating in Colombia, primarily in southeastern Colombia in and around sparsely populated rural and jungle areas, which engaged in the hostage taking of United States nationals, other foreign nationals, Colombian nationals affiliated with the political, military, and law enforcement components of the Colombian government, and other high level Colombian citizens.

3.      All of the acts referred to in this Count of the Indictment were committed in and around the Republic of Colombia, that is, outside of the jurisdiction of any particular state or district of the United States, but within the extraterritorial jurisdiction of the United States and, therefore, pursuant to Title 18, United States Code, Section 3238, within the venue of the United States District Court for the District of Columbia.

4.      From on or about February 13, 2003, and continuing thereafter up to and including the present, within the Republic of Colombia, defendants GERARDO ANTONIO AGUILAR RAMIREZ, also known as Cesar, also known as El Cucho, ALEXANDER FARFAN SUAREZ, also known as Enrique Gafas, and others, unknown to the Grand Jury, did knowingly

and intentionally seize and detain and threaten to kill, injure and continue to detain three

nationals of the United States: Marc D. Gonsalves, Thomas R. Howes, and  Keith D. Stansell, in

order to compel a third person and a governmental organization to do an act, and to abstain from

doing an act, as an explicit and implicit condition for the release of the person detained, that is, to

pay ransom, to implement a specified agreement, to extract political concessions from the

Colombian government, to release hundreds of FARC terrorists currently held in Colombia by

the government of Colombia, and to require the government of Colombia to carve out of its

sovereign territory a demilitarized zone for the benefit of the FARC.  Marc D. Gonsalves is a

United States national and citizen.  He was a systems analyst for California Microwave Systems,

a division of Northrop Grumman Electronic Systems, an American company doing business in

the Republic of Colombia.  Thomas R. Howes is a United States national and citizen.  He was a

pilot for California Microwave Systems.  Keith D. Stansell is a United States national and

citizen.  He was a systems analyst for California Microwave Systems.

     5.     From on or before at least sometime in 2006, the exact date being unknown to the

Grand Jury, and continuing thereafter up to and including at least April 27, 2007, Marc D.

Gonsalves, Thomas R. Howes, and Keith D. Stansell were detained by the FARC's 1st Front, in

the department of Vichada.  At all times relevant to this paragraph, ALEXANDER FARFAN

SUAREZ, also known as Enrique Gafas, was a high ranking officer within the FARC's 1st Front,

and he was specifically responsible, as directed by GERARDO ANTONIO AGUILAR

RAMIREZ, also known as Cesar, also known as El Cucho, the FARC 1st Front commander, for

maintaining the detention of Marc D. Gonsalves, Thomas R. Howes, and Keith D. Stansell.

**(Hostage Taking and Aiding and Abetting and Causing an Act to be Done**, in violation of Title 18, United States Code, Sections 1203 and 2)

A TRUE BILL

FOREPERSON

Attorney of the United States in
and for the District of Columbia