

U.S. Department of Justice

Ronald C. Machen Jr.
United States Attorney

*District of Columbia*

**FILED**

MAR 17 2010

U.S. DISTRICT COURT

---

*Judiciary Center*
*555 Fourth St., N.W*
*Washington, D.C. 20530*

March 12, 2010

John J. Carney, Esq.
Carney & Carney
601 Pennsylvania Ave., N.W.
South Building, Suite 900
Washington, D.C. 20004

Let this be filed
Royce C. Lamberth
U.S.D.J.  3/17/10

Re:   United States v. Nancy Conde Rubio, Crim. No. 07-248-2 (RCL)

Dear Attorney Carney:

      This letter confirms the agreement between your client, Nancy Conde Rubio, and the Office of the United States Attorney for the District of Columbia (hereinafter also referred to as "the Government" or "this Office"). If your client accepts the terms and conditions of this offer, please have your client execute this document in the space provided below. Upon receipt of the executed document, this letter will become the plea agreement. The terms of the offer are as follows:

Conde Rubio's Obligations, Acknowledgments and Waivers:

    1.    Your client, Nancy Conde Rubio, agrees to admit guilt and enter a plea of guilty to count-one of the above-referenced and pending indictment, charging your client with conspiracy to provide material support or resources to a Foreign Terrorist Organization ("FTO") in violation of 18 U.S.C. § 2339B(a)(1). Your client understands that pursuant to 18 U.S.C. § 2339B, the providing material support charge carries a penalty of up to fifteen years' imprisonment, a fine of up to $250,000, and up to three years' supervised release. In addition, your client agrees to pay a special assessment of $100 per felony conviction to the Clerk of the United States District Court for the District of Columbia prior to the date of sentencing. Your client understands that pursuant to 18 U.S.C. Section 3571 and Section 5E1.2 of the Sentencing Guidelines, the Court may also impose a fine that is sufficient to pay the federal government the costs of any imprisonment, term of supervised release, and period of probation.

and divided into seven guerrilla divisions known as blocs, which are divided into over sixty fronts, or companies. The FARC relies on a network of supporting individuals (known as "collaborators," as opposed to being guerillas). These individuals assist the FARC by procuring and supplying commercial items, such as telecommunications equipment.

The FARC is known to conduct hostage-takings and other violent acts in order to compel governments, businesses, and individuals to act or refrain from taking actions. While conducting hostage-taking and other violent acts, the FARC is known to use sophisticated communications devices, including satellite telephones.

The FARC is a designated foreign terrorist organization ("FTO"), having been so designated pursuant to Title 8, United States Code, Section 1189, by the Secretary of State of the United States, initially in October 1997, and most recently on October 11, 2005.

### FARC 1st Front Activities

The 1st Front of the FARC operates primarily in the rural and jungle Colombian states of Meta, Guaviare, and Vaupes. The 1st Front distributes cocaine to narcotics traffickers in exchange for money, weapons, and equipment -- including high technology communications devices. The weapons and equipment procured by the 1st Front are later used to conduct terrorist attacks, including those directly targeting Americans.

To supply itself, the FARC's 1st Front relies on a logistical support network of individuals with access to Colombia's metropolitan and commercial centers, such as Bogota and Villavicencio, and access to product markets in other countries. It also relies on individuals involved in trafficking in narcotics, who have access to weapons, foreign currency, and other supplies, such as high technology communications equipment. Narcotics traffickers obtain FARC-produced or FARC-

controlled cocaine, deliver it to neighboring countries, and in return transport weapons, ammunition, money and other supplies to the FARC. These traffickers use their drug networks to procure these items and transport them to the FARC in airplanes via clandestine airstrips located in Colombia and Venezuela, in trucks, and in river boats navigating remote jungle rivers that traverse rural areas of Colombia and neighboring countries. These narcotics traffickers and other members of the logistical network transport currency, high technology communications equipment, computers, military materiel, and other materials and supplies from other countries and urban areas of Colombia into the rural regions of Colombia controlled by the FARC. The members of the support network conduct their trade and transactions in Colombia's metropolitan and commercial centers, including Bogota and Villavicencio, in other countries in South America, Central America, and in the United States.

    The FARC's logistical support network requires communication between all parties to succeed. The remote rural and jungle areas of Colombia controlled by the FARC lack an established communications network. There are no telephone land lines. There is no cellular telephone service. Satellite telephone is the sole long-range means of electronic voice communication. High frequency ("HF") radios (also known as two-way radios or walkie-talkies) are readily available, but they have a very limited range. The FARC uses satellite phones in order to communicate with its logistical support network in major Colombian urban areas and beyond, including the United States. The FARC uses HF radios to reach closer urban outposts such as Villavicencio. In addition to communicating with members of its logistical network located in Villavicencio, the FARC uses radio call centers located in Villavicencio to connect HF callers with callers using cellular telephones or land lines, thereby enabling FARC members in the jungle to communicate with members of its logistical network located in other major Colombian urban areas and beyond.

**Defendant's Criminal Activities**

From on or before at least sometime in 2002, and continuing thereafter up to and including at least July 2007, in the Republic of Colombia, the defendant, NANCY CONDE RUBIO, also known as Doris Adriana, also known as Alexandra Rubio Silva, also known as Maritza, also known as La Señora (hereinafter "CONDE RUBIO"), and her co-conspirators did knowingly combine, conspire, confederate and agree, together, and with each other, to provide material support and resources to a designated foreign terrorist organization, namely the FARC, knowing that the organization has engaged or engages in terrorist activity, and has engaged or engages in terrorism.

Then FARC 1st Front Commander Gerardo Antonio Aguilar Ramirez, also known as César (hereinafter "César "), and CONDE RUBIO – at that time the FARC 1st Front's fourth-ranking member – were the leaders of a logistical support network. César and CONDE RUBIO directed other members of the logistical support network to obtain materials and supplies, including communications equipment, from persons operating businesses in the United States; used these other members to transport these materials as well as the money used to finance the logistical support network; used these other members to set up a communications network to operate the logistical support network; and used the high technology communications equipment, such as satellite telephones procured from the United States and other communications devices, to facilitate the shipment of materials and supplies to the FARC and to transfer funds from the FARC to members of the conspiracy for the purchase of materials and supplies. The logistical support network in turn supported the FARC's other activities, including hostage-taking and other violent acts.

The logistical network's base of operations was in the city of Villavicencio, which sits on a plateau on the edge of Colombia's easternmost mountain range approximately a two-hour drive from

Colombia's capital city of Bogota. Villavicencio overlooks the dense jungle and rural areas of southeastern Colombia where the FARC's 1st Front operates, and is known as the "Gateway to the Jungle."

CONDE RUBIO often communicated with her logistical network through radio call centers located in Villavicencio. These centers had the technical capacity to receive calls from FARC members using the short-range HF radios, and to patch them through to the more advanced and long-range land line and cellular phone networks operating in the more urban parts of Colombia, and to patch calls to other countries, including the United States. Two of these call centers were owned and operated on behalf of the FARC by co-defendants Ana Isabel Pena Arevalo, also known as Doña Chava, also known as Doña Isa, also known as Isabela, also known as Elisa (hereinafter "Pena Arevalo"), and Luz Mery Gutierrez Vergara, also known as Mery, also known as Luz Mery (hereinafter "Gutierrez Vergara"). The call centers also are used to deliver and receive oral and written messages, and as a drop-off and pick-up site for money.

CONDE RUBIO used profits from the sale of cocaine to procure communications equipment purchased in the United States, such as satellite telephones, SIM cards, and other high technology devices, and then used this equipment to operate the logistical supply network. She used communications equipment, such as satellite telephones and HF radios, and the radio call centers to communicate with each other in order to facilitate the procurement and shipment of supplies intended for the FARC, and to facilitate the transfer of funds from the FARC to members of the conspiracy, who used the funds to purchase or transport supplies intended for the FARC. She also used satellite telephones to contact a telecommunications company located in Miami, Florida, to purchase additional use minutes for the phone, and, together with César, to obtain technical advice

on the use and operation of the satellite telephones.

CONDE RUBIO arranged for the shipment of materials and supplies from various urban areas within Colombia and from other countries, including the United States, to the city of Villavicencio. From Villavicencio, CONDE RUBIO's co-conspirators, at her direction, covertly supplied the FARC by, among other means, flying materials on small twin engine planes, such as DC-3s, to rural and jungle airstrips in areas influenced or controlled by the FARC, whereupon they were transported to FARC camps via truck or river boat. CONDE RUBIO's co-conspirators, also at her direction, delivered large sums of cash to Villavicencio to be picked up by her co-conspirators for the purpose of financing the purchase of materials and supplies.

Members of the logistical network, at the direction of CONDE RUBIO, would order and receive materials and supplies intended for the FARC, and then ship them to CONDE RUBIO and the FARC. Members of the material support network based in Villavicencio or Bogota also would travel throughout Colombia, meet with other members of the material support network in order to obtain, ship, or deliver additional materials and supplies back to Villavicencio for shipment to the FARC. Members of the logistical network oftentimes would prepare fraudulent air shipment manifests or bribe airport or airline employees in order to fraudulently ship material items to the FARC through Vanguardia Airport in Villavicencio.

From in or about February 2003, and continuing through in or about September 2004, one of CONDE RUBIO's co-conspirators provided satellite telephones and SIM cards originating from the United States to another co-conspirator, who in turn provided them to the FARC, including to high-ranking FARC members César and CONDE RUBIO. In or about May 2003, one co-conspirator introduced another co-conspirator to CONDE RUBIO for the purpose of allowing

CONDE RUBIO to purchase satellite telephones, SIM cards, and HF radios, all originating in the United States, directly from the co-conspirator.

On or about sometime in March 2005, CONDE RUBIO ordered and received three HF radios from a co-conspirator located in the United States. These HF radios, delivered by another co-conspirator, were intended to be used by CONDE RUBIO to further FARC-related activities. On or about April 14, 2005, and again on or about May 16, 2005, CONDE RUBIO obtained satellite telephones and SIM cards originating in the United States from a co-conspirator, that CONDE RUBIO intended to use to further FARC-related activities.

On or about October 1, 2006, a co-conspirator received a satellite telephone originating in the United States that CONDE RUBIO intended to use to further FARC-related activities. On or about November 9, 2006, CONDE RUBIO received a satellite telephone originating from the United States that was intended to be used by Cesar to further FARC-related activities.

During the time CONDE RUBIO was engaged in the aforementioned contacts and transactions involving the FARC, CONDE RUBIO was aware that the FARC was engaged in terrorist activity.

## Limited Nature of Statement of Facts

This is a summary of the government's evidence in support of defendant's guilty plea. As such it is not intended to constitute a complete statement of all facts known by the defendant or the government but is a minimum statement of facts intended to provided the necessary factual predicate for her guilty plea. The limited purpose of this Statement of Facts is to demonstrate that there exists a sufficient legal basis for the defendant's plea of guilty to count one of the pending indictment.

Respectfully submitted,

RONALD C. MACHEN JR.
UNITED STATES ATTORNEY
D.C. Bar No. 447-889

By: M. Jeffrey Beatrice
MA Bar No. 551821
Lynn E. Haaland
D.C. Bar No. 454120
Assistant United States Attorneys
David P. Cora, Trial Attorney
Counterterrorism Section
National Security Division

**Defendant Nancy Conde Rubio Acceptance**

I have read this Statement of Facts setting forth the facts as to my providing material support or resources to a FTO in violation 18 U.S.C. § 2339B(a)(1). I have discussed this Statement of Facts with my attorney, John J. Carney, Esq. I fully understand this Statement of Facts, and I acknowledge its truthfulness, agree to it, and accept it without reservation. I do this voluntarily and of my own free will. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Statement of Facts fully.

Date: 03 18 10

Nancy Conde
Nancy Conde Rubio
Defendant

**Attorney's Acknowledgment**

I have read each of the pages constituting the government's Statement of Facts as to my client providing material support or resources to a FTO in violation 18 U.S.C. § 2339B(a)(1). I have reviewed the entire Statement of Facts with my client and have discussed it with her fully.

Date: 3/17/10

John Carney
John J. Carney, Esq.
Counsel for Nancy Conde Rubio